# STATE OF MINNESOTA
# IN COURT OF APPEALS
## A25-0806
## A25-0821
## A25-1125

In re Cottonwood County's Decision on the Need for an Environmental Impact Statement for the Proposed Sioux Rock Quarry Expansion Project in Delton Township.

-------------------------

In the Matter of the Application of OMG Midwest, Inc. d/b/a Minnesota Paving and Materials for a Conditional Use Permit.

**Filed October 13, 2025**
**Appeal to proceed (A25-0821)**
**Appeal dismissed (A25-1125)**
**Frisch, Chief Judge**

Cottonwood County Board of Commissioners
Resolution No. 25-04-15

Keith Ellison, Attorney General, Oliver J. Larson, Philip S. Pulitzer, Assistant Attorneys General, St. Paul, Minnesota (for relators Minnesota Pollution Control Agency and Department of Administration)

Jeffrey M. Markowitz, Corey S. Bronczyk, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, Minnesota (for respondent OMG Midwest Inc., d/b/a Minnesota Paving and Materials)

Nicholas A. Anderson, Cottonwood County Attorney, Windom, Minnesota; and

Jay T. Squires, Michael J. Ervin, Squires, Waldspurger & Mace P.A., Minneapolis, Minnesota (for respondent Cottonwood County Board of Commissioners)

Considered and decided by Frisch, Chief Judge; Smith, Tracy M., Judge; and Ede, Judge.

## SYLLABUS

A state agency with permitting or other approval authority over a project may be aggrieved when a responsible governmental unit decides not to require an environmental-impact statement for the project, and, in such a situation, a state agency has standing to appeal the responsible governmental unit's decision under Minn. Stat. § 116D.04, subd. 10 (2024).

## SPECIAL TERM OPINION

**FRISCH**, Chief Judge

Relators Minnesota Pollution Control Agency (MPCA) and Minnesota Department of Administration (MDA) (together, the state relators) filed two appeals to challenge decisions made by respondent Cottonwood County Board of Commissioners (the county) in relation to a project proposed by respondent OMG Midwest, Inc., d/b/a Minnesota Paving & Materials (MPM).[1]  Both appeals center on concerns about the project's potential impacts on the nearby Jeffers Petroglyphs, property listed on the state register of historic sites.  *See* Minn. Stat. § 138.662, subd. 17 (2024).  MPM moved to dismiss both appeals, arguing that the state relators lack standing to challenge the county's decisions.  In a special term order, we denied the motion as to the first appeal (A25-0821), concluding that the state relators established standing to appeal the county's determination that an

---

[1] This opinion uses acronyms for the following terms: environmental-assessment worksheet (EAW); environmental-impact statement (EIS); Environmental Quality Board (EQB); interim-use permit (IUP); Minnesota Department of Administration (MDA); Minnesota Paving & Materials (MPM); Minnesota Pollution Control Agency (MPCA); responsible governmental unit (RGU); and State Historic Preservation Office (SHPO).

environmental-impact statement (EIS) is not necessary for MPM's project. We granted the motion as to the second appeal (A25-1125), concluding that the state relators had not established standing to appeal the county's grant of an interim-use permit (IUP) for the project. We indicated that this special term opinion would follow. We now explain our reasoning.[2]

**FACTS**

In response to a citizen petition under the Minnesota Environmental Policy Act (MEPA), Minn. Stat. §§ 116D.01-.11 (2024), the county prepared an environmental-assessment worksheet (EAW) for a project proposed by MPM. An EAW is "a brief document which is designed to set out the basic facts necessary to determine whether an EIS is required for a proposed project." Minn. R. 4410.0200, subp. 24 (2023). According to the EAW prepared by the county, the purpose of MPM's proposed project is to "expand the approved mineral extraction area of the existing [MPM] Sioux Rock quarry to help meet market . . . demand for sand and aggregate rock in the construction industry." MPM's activities at the quarry consist of "blasting, crushing, dewatering, size classification, and reclamation activities." And the EAW provides that the "project will include expanding the mineral extraction area of the existing mine operation by approximately 10 acres across two parcels of land."

---

[2] Relators Lower Sioux Indian Community in the State of Minnesota and Kevin O'Keefe (the tribal relators) also filed certiorari appeals to challenge the county's EIS (A25-0806) and IUP (A25-1104) decisions. We consolidated the EIS appeals of the tribal relators and the state relators. MPM did not move to dismiss the tribal relators' appeals, and those appeals are not the subject of this opinion.

After publishing the EAW and accepting public comments, the county adopted a resolution determining that it was not necessary to prepare an EIS for the project. An EIS is

> an analytical rather than an encyclopedic document that describes the proposed action in detail, analyzes its significant environmental impacts, discusses appropriate alternatives to the proposed action and their impacts, and explores methods by which adverse environmental impacts of an action could be mitigated. The [EIS] must also analyze those economic, employment, and sociological effects that cannot be avoided should the action be implemented.

Minn. Stat. § 116D.04, subd. 2a(a). An EIS is required, as pertinent here, when a responsible governmental unit (RGU) determines, based on an EAW, that a project has the potential for significant environmental effects. *See* Minn. R. 4410.1700, subps. 1, 3 (2023). The county in this case determined that MPM's project does not have the potential for significant environmental effects and thus an EIS is not required.

Following its EIS decision, the county granted an IUP for the project. The IUP is a form of a conditional-use permit under the county's zoning ordinance. Cottonwood County, Minn., Zoning Ordinance (CCZO) § 18 (2015). The ordinance defines a conditional use as

> [a] land use or development as defined by ordinance that would not [be] appropriate generally but may be allowed with the appropriate restrictions as provided by official controls upon a finding that certain conditions as detailed in the zoning ordinance exist, the use or development conforms to the comprehensive land use plan of the community, and the use is compatible with the existing neighborhood.

4

CCZO § 4, subd. 2 (2008); *see also* Minn. Stat. §§ 394.22, subd. 7 (defining conditional use), .301 (authorizing counties with zoning authority to allow conditional use under certain circumstances), .303 (defining interim use and authorizing zoning authorities to allow interim uses under certain circumstances) (2024). MPM needs the IUP because the land it proposes to use for mining activities is zoned for agricultural use but allows mining as a conditional use.

The state relators filed certiorari appeals to challenge the county's EIS and IUP decisions. MPM filed a motion to dismiss both appeals, asserting that the state relators lack standing to appeal either the EIS or the IUP decision. The state relators filed a response opposing the motion.

## ISSUES

I.      Have the state relators established standing to appeal the county's EIS decision?

II.     Have the state relators established standing to appeal the county's IUP decision?

## ANALYSIS

"Standing is a jurisdictional doctrine," and the absence of standing bars our consideration of an appeal. *Richards v. Reiter*, 796 N.W.2d 509, 512 (Minn. 2011). "To have standing, a party must have a sufficient stake in a justiciable controversy to seek relief from a court." *Growe v. Simon*, 2 N.W.3d 490, 499 (Minn. 2024) (quotation omitted). In Minnesota, "[s]tanding to appeal may be conferred by a statute or by the appellant's status as an aggrieved party." *Richards*, 796 N.W.2d at 513; *see also Growe*, 2 N.W.3d at 499 n.6 (noting that state courts are "not bound by the standing constraints of Article III of the United States Constitution").

5

Minnesota courts have accorded the same meaning to the term "aggrieved party" regardless of whether standing arises pursuant to statute or by judicial manifestation. *Compare Richards*, 796 N.W.2d at 513 (addressing appeal from appealable order under Minn. R. Civ. App. P. 103.03), *with Stansell v. City of Northfield*, 618 N.W.2d 814, 818 (Minn. App. 2000) (addressing statutory standing), *rev. denied* (Minn. Jan. 26, 2001); *see also Minn. Educ. Ass'n v. Indep. Sch. Dist. No. 404*, 287 N.W.2d 666, 669 (Minn. 1980) (favorably comparing statutory and judicial standards). A party's "status as an aggrieved party depends on whether there is injury to a legally protected right." *Richards*, 796 N.W.2d at 513 (quotation omitted). Stated differently, to be aggrieved, a "person must be 'injuriously or adversely affected by [a decision] when it operates on [their] . . . personal interest.'" *Stansell*, 618 N.W.2d at 818 (quoting *In re Getsug*, 186 N.W.2d 686, 689 (Minn. 1971)). The supreme court has further explained:

> To have standing to petition successfully for writ of certiorari . . . [a] person must articulate with a degree of clarity some legally cognizable interest of his which has sustained injury in fact by the agency action—i.e., that he has in fact sustained injury to some interest which differs from injury to the interests of other citizens generally.

*In re Sandy Pappas Senate Comm.*, 488 N.W.2d 795, 797 (Minn. 1992). "[I]n its judicial manifestation, standing cannot come into existence solely by participation in agency proceedings." *Id.* at 798. Moreover, "[a] mere 'interest' in the problem, regardless that the interest is longstanding, does not confer standing on an individual or organization." *Id.* Nor does a party's expertise on an issue render it adversely affected or aggrieved. *Id.*

6

As the parties seeking to invoke our jurisdiction, the state relators bear the burden of demonstrating that they have standing. *See Webb Golden Valley, LLC v. State*, 865 N.W.2d 689, 693 (Minn. 2015) (stating that plaintiff-appellant "must establish an injury-in-fact to have standing"); *accord Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (stating that a plaintiff "bears the burden of establishing standing as of the time she brought the lawsuit and maintaining it thereafter" (quotation omitted)). And they must satisfy this burden as to their appeal of each county decision. *See State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 493 (Minn. 1996) (explaining that "analysis of standing turns on the specific statutory or common law requirements of each type of claim advanced"). The state relators generally argue that they have "standing to sue." But they do not differentiate between the county's EIS and IUP decisions or explain why they have standing to seek certiorari review of each of the county's separate decisions. We address in turn below whether the state relators have established standing to appeal the county's EIS and IUP decisions.

## I. The state relators have established standing to appeal the county's EIS decision.

The county's EIS decision is subject to certiorari review under Minn. Stat. § 116D.04, subd. 10, which provides:

> A person aggrieved by a final decision on the need for an environmental assessment worksheet, the need for an environmental impact statement, or the adequacy of an environmental impact statement is entitled to judicial review of the decision under sections 14.63 to 14.68. . . . The [Environmental Quality Board (EQB)] may initiate judicial review of decisions referred to herein and the [EQB] . . . may intervene as of right in any proceeding brought under this subdivision.

7

The statute explicitly affords the EQB standing to appeal from the county's EIS decision. The issue before us is whether the state relators, who are not expressly referenced in the statute, have standing to appeal the county's EIS decision as "person[s] aggrieved."

MPM argues that the state relators are not aggrieved by the county's EIS decision because the decision does not adversely affect the state relators' interests. The state relators counter that the county's failure to conduct adequate environmental review impacts their interests as state agencies with statutory obligations to protect the environment, including historical resources. To resolve this dispute, we begin by examining the nature of the county's decision.

MEPA sets forth the state's public policy of environmental protection and imposes numerous duties on state agencies in relation to that public policy. *See* Minn. Stat. §§ 116D.02, .03. Pertinent here is the duty of an RGU to prepare an EAW or EIS when required. *See* Minn. Stat. § 116D.04, subd. 2a.[3] The general rule is that an EIS is required when a project has the "potential for significant environmental effects." *Id.*, subd. 2a(a); Minn. R. 4410.1700, subp. 1. As directed by statute, the EQB adopted administrative rules identifying categories requiring the preparation of an EAW or EIS and designating the RGU obligated to prepare the required environmental review. *See* Minn. Stat. § 116D.04, subd. 2a(b); Minn. R. 4410.1000, .2000 (2023). Importantly here, historical resources are among the resources that MEPA seeks to protect. *See* Minn. Stat. § 116D.04, subd. 1a(a); Minn. R. 4410.0200, subp. 23 (2023).

---

[3] An RGU may be a state agency or a local governmental unit. *See generally* Minn. R. 4410.4300, .4400 (2023) (designating RGUs for mandatory EAW and EIS categories).

"MEPA's purpose is 'to force agencies to make their own impartial evaluation of environmental considerations before reaching their decisions.'" *Iron Rangers for Responsible Ridge Action v. Iron Range Res.*, 531 N.W.2d 874, 880 (Minn. App. 1995) (quoting *No Power Line, Inc. v. Minn. Env't Quality Council*, 262 N.W.2d 312, 327 (Minn. 1977)), *rev. denied* (Minn. July 28, 1995). Thus, no final government approvals may be granted and construction may not begin on a project until any required environmental review is complete. *See* Minn. Stat. § 116D.04, subd. 2b; *In re Applications of Enbridge Energy, Ltd. P'ship*, 930 N.W.2d 12, 20 (Minn. App. 2019). Consistent with the requirement that environmental review inform governmental decision-making, an EAW must identify those permits a project proposer must obtain from a governmental unit or units. Minn. R. 4410.1200(F) (2023). But MEPA directs that just one governmental unit—the RGU—complete any required environmental review to inform the RGU's own decisions and those of other governmental units. *See* Minn. Stat. § 116D.04, subd. 2a(a), (b), (e), (i); Minn. R. 4410.1000, .1100, .2000 (2023).

In this case, the county prepared an EAW for MPM's project after the EQB received a citizen petition from the requisite number of individuals and designated the county as the RGU to act on the petition. *See* Minn. Stat. § 116D.04, subd. 2a(e); Minn. R. 4410.1100. The EAW references the Jeffers Petroglyphs, stating that "[i]ndirect effects of the proposed project on the Jeffers Petroglyphs, which is a [National Register of Historic Places]-listed site, will be considered to mitigate any potential adverse indirect effects from the operation of the quarry." The EAW also references consultation with the State Historic Preservation Office (SHPO), a division of the MDA, and appends correspondence in which the SHPO

9

emphasizes the cultural and historical importance of the Jeffers Petroglyphs and the need for study on the indirect effects of the project. And the EAW identifies two permits that the project requires from the MPCA—a National Pollutant Discharge Elimination System/State Disposal System permit and an air-emissions permit. The state relators each submitted comments raising concerns about the project's potential impacts on the Jeffers Petroglyphs and asserting that the EAW does not adequately address those potential impacts. The MPCA urged the county to prepare an EIS or, alternatively, to postpone the decision on the need for an EIS so that additional information could be gathered. *See* Minn. R. 4410.1700, subp. 2a (2023) (directing RGU with insufficient information to either prepare an EIS or postpone decision to gather additional information).

In opposing MPM's motion to dismiss, the state relators argue that they are aggrieved because the county's decisions impact their ability to fulfill statutorily imposed duties in relation to environmental protection. The MPCA notes its regulatory role in relation to air quality and argues that it is aggrieved by the county's EIS decision because the project may have adverse environmental effects.[4] *See* Minn. Stat. § 116.081, subd. 1 (2024). The MDA asserts that it has standing by virtue of a requirement in the Minnesota Historic Sites Act, Minn. Stat. §§ 138.661-.669 (2024), that governmental units consult with the SHPO "[b]efore carrying out any undertaking that will affect designated or listed

---

[4] The MCPA is the state agency charged with enforcing the federal Clean Air Act in Minnesota. *See* 40 C.F.R. pt. 70, App. A (2025); *see also* Minn. Stat. § 116.07, subds. 2(a), 4a(a) (2024) (authorizing MPCA to set air-pollution standards and issue air-emissions permits).

properties, or funding or licensing an undertaking by other parties."[5] Minn. Stat. § 138.665, subd. 2. The MDA asserts that "SHPO is the only entity with authority to enforce the consultation requirement" and that it has suffered a cognizable injury because the county has not fulfilled its consultation obligation. The state relators further assert that "[a]n agency's failure to follow [MEPA's] prescribed procedures creates a risk that serious environmental consequences of the agency action will not be brought to the decisionmaker's attention."

Given the purpose and operation of MEPA, and in light of the statutory duties of the state relators, we are persuaded that the state relators have standing to appeal the county's EIS decision. When an RGU decides not to prepare an EIS, state agencies with permitting or other approval authority must either render a permitting or other approval decision based on the limited information in the EAW or divert their own resources to additional investigation to inform their decision. *Cf.* Minn. Stat. § 116D.04, subd. 2a(i) ("Whenever practical, information needed by a governmental unit for making final decisions on permits

---

[5] More specifically, governmental units must consult

> pursuant to the [SHPO's] established procedures to determine appropriate treatments and to seek ways to avoid and mitigate any adverse effects on designated or listed properties. If the state department or agency and the [SHPO] agree in writing on a suitable course of action, the project may proceed. If the parties cannot agree, any one of the parties may request that the governor appoint and convene a mediation task force consisting of five members, two appointed by the governor, the chair of the State Review Board of the [SHPO], the commissioner of administration or the commissioner's designee, and one member appointed by the director of the Minnesota Historical Society.

Minn. Stat. § 138.665, subd. 2.

11

or other actions required for a proposed project must be developed in conjunction with the preparation of an [EIS].").  These state agencies therefore have a definite stake in EIS decisions that is distinct from the interests of the general citizenry and reach further than the agencies' mere expertise or interest in the issues.  We therefore hold that a state agency with permitting or other approval authority over a project may be aggrieved when an RGU decides not to require an EIS for the project, and, in such a situation, a state agency has standing to appeal the RGU's decision under Minn. Stat. § 116D.04, subd. 10.  And in this case, the state relators have established that they have permitting and other approval authority over MPM's project, such that the county's alleged failure to conduct adequate environmental review is specifically injurious to them.  Accordingly, the state relators have standing to appeal the county's EIS decision.

## II.     The state relators have not established standing to appeal the county's IUP decision.

The county's IUP decision is a quasi-judicial decision for which there is no statutory right of appeal and is thus appealable through a certiorari petition pursuant to Minn. Stat. §§ 606.01-.02 (2024).  *See Interstate Power Co. v. Nobles Cnty. Bd. of Comm'rs*, 617 N.W.2d 566, 574 & n.5 (Minn. 2000).  Such a certiorari appeal may be taken by "an aggrieved party." *In re Haymes*, 444 N.W.2d 257, 259 (Minn. 1989); *see also* CCZO § 6, subd. 5 (2016) (providing that "[a]ny aggrieved person" may seek certiorari review of final zoning decision).  Although the same aggrieved-person standard applies to both of the state relators' appeals, we focus now on whether the state relators have established that they are "injuriously or adversely affected by" the county's IUP decision because "it operates

on . . . [their] personal interest." *Stansell*, 618 N.W.2d at 818 (quoting *Getsug*, 186 N.W.2d at 689).

The state relators advance the same standing arguments in relation to the county's IUP decision as in relation to the county's EIS decision. But the county's decisions are distinct. We again begin by examining the nature of the decision at issue.

The county is authorized by statute to "carry on county planning and zoning activities." Minn. Stat. § 394.21, subd. 1 (2024). "[T]he purpose of zoning laws is to control land use and development in order to promote public health, safety, welfare, morals, and aesthetics." *City of Waconia v. Dock*, 961 N.W.2d 220, 231 (Minn. 2021) (quotation omitted). "More narrowly, zoning ordinances are regarded as being aimed primarily at conserving property values and encouraging the most appropriate use of land." *Id.* (quotation omitted). Consistent with these purposes, we have required parties to identify specific property or personal interests that will be impacted by zoning decisions to establish standing to challenge those decisions. *See Citizens for a Balanced City v. Plymouth Congregational Church*, 672 N.W.2d 13, 18-19 (Minn. App. 2003) (concluding that advocacy group's allegations of detrimental effects that would be caused to neighborhood by conditional-use permit demonstrated particularized property and personal interests); *Stansell*, 618 N.W.2d at 818 (concluding that city residents lacked standing to oppose zoning ordinance allowing construction of a store because they did not "allege that they have suffered any specific injuries" and "seem[ed] to be litigating a matter of public interest").

Here, MPM needs the IUP to conduct mining operations as a conditional use, and the county granted the IUP pursuant to its statutory authority to regulate land use. The state relators have not identified any specific property or personal interests impacted by the county's IUP decision. In contrast to their persuasive arguments about the EIS decision, the state relators have not demonstrated that the county's IUP decision impacts their ability to perform their statutory duties or is otherwise specifically injurious to them, which is their burden. And the state agencies have not set forth any impediment to the fulfillment of their statutory obligations. The state relators may have an interest in and expertise on the issues that will be raised in the IUP appeal. But that interest and expertise is, without more, insufficient to confer standing upon the state relators to appeal the county's IUP decision. *See Sandy Pappas Senate Comm.*, 488 N.W.2d at 798 (concluding that a registered voter's interest in the problem and experience in evaluating the problem did not confer standing to appeal state ethics board's adjudication of liability). Accordingly, the state relators' certiorari appeal from the IUP decision is dismissed.[6]

## DECISION

A state agency with permitting or other approval authority over a project may be aggrieved when an RGU decides not to require an EIS for the project, and, in such a situation, a state agency has standing to appeal the RGU's decision under Minn. Stat. § 116D.04, subd. 10. Based on their permitting and other approval authority over MPM's

---

[6] We note that our decision is limited to the issue of whether the state relators have established standing based on the arguments made in this certiorari appeal. We express no opinion on any other relief available to the state with respect to the project.

14

project, the state relators have established standing to appeal the county's EIS decision. But the state relators have not established standing to appeal the county's IUP decision. Accordingly, the state relators' appeal of the EIS decision shall proceed, and their appeal from the IUP decision is dismissed.

**Appeal to proceed (A25-0821); appeal dismissed (A25-1125).**